**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **LISE HALL,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-23-2647** |
| **ASTRAZENECA PHARMACEUTICALS LP,** | * | |
| | * | |
| **Defendant.** | | |

# MEMORANDUM OPINION

After Lise Hall's position was eliminated as part of a corporate reorganization and her employment was terminated, she filed suit against her former employer, AstraZeneca Pharmaceuticals LP ("AstraZeneca"), and her former supervisor, Praveen Akkinepally. Hall claims she was discriminated against based on her sex, pregnancy, and family responsibilities in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.* and Chapter 27 of the Montgomery County Code ("MCC").

AstraZeneca has moved for summary judgment. The motion is granted. Judgment on the MFEPA and MCC claims is entered for AstraZeneca.[1]

## I. Background

AstraZeneca is "a science-led pharmaceutical company focused on the discovery, development, and commercialization of prescription medicines." ECF 57-1, at 8. Hall began

[1] The Court previously granted summary judgment to AstraZeneca on Hall's claim under the Maryland Wage Payment and Collection Law, Count III. ECF 75. This opinion does not address that claim.

working at AstraZeneca's offices in Montgomery County, Maryland in January 2015. ECF 21, at 1, 3.

From August 2019 through December 2022, Hall held the position of Global Associate Director, Patient Centricity, Lung Cancer. ECF 21, ¶ 12; ECF 57-3, ¶ 14. Hall's job requisition stated that she was "responsible for the development and implementation of patient centric strategies and solutions to enhance the patient journey for people living with lung cancer." ECF 57-12, at 3. Hall's responsibilities included developing "new patient solutions to address . . . barriers [and] opportunities in the lung cancer journey"; managing the "global online community, LVNG With Lung Cancer" ("LVNG With"); "develop[ing] and implement[ing] patient marketing strategy for Tagrisso," a lung cancer medicine developed by AstraZeneca; and developing a "patient centricity framework to guide brand plans across lung cancer businesses." *Id.* at 4.

Hall's direct supervisor during the relevant period was Praveen Akkinepally. ECF 57-37, at 9. Akkinepally served as Global Head of Lung Cancer Commercialization from April 2021 to October 2023. ECF 57-3, ¶¶ 3, 7. Akkinepally was responsible for developing "an above-brand commercialization strategy for AstraZeneca's entire lung cancer portfolio." *Id.* ¶ 8. This above-brand strategy was referred to internally as the Lung Tumor Leadership Plan or "TLP." *Id.* ¶ 9. In his declaration, Akkinepally states that "[a]s the TLP developed," its work "broaden[ed] . . . to be more healthcare provider centric." *Id.* ¶ 19. Akkinepally explained that the two audiences require different marketing strategies: marketing to healthcare providers must be more "science-based and

technical," whereas marketing to patients focuses on raising awareness of a medicine so that patients can approach their healthcare providers about it. *Id.* ¶¶ 11–13.[2]

Akkinepally attested that "Hall's responsibilities were by-and-large focused on patient-centric marketing initiatives" and on brand-level work supporting the Tagrisso team, which was marketing the Tagrisso drug following its successful clinical trial and was a separate team from the Lung Cancer Commercialization Team. *Id.* ¶¶ 16–17; ECF 57-17, at 84. Akkinepally testified at his deposition that a "significant proportion of [Hall's] responsibilities were focused on patients." ECF 57-17, at 78. By all accounts, Hall performed well in her role. *See* ECF 57-6, at 55–57 (testimony from Global Human Resources ("HR") Business Partner Nicole Hardt that she did not recall seeing any negative performance review or disciplinary record in Hall's personnel file); ECF 57-17, at 30 (Akkinepally testimony that he did not have "any problem" with Hall's performance).

Hall testified that her responsibilities continued to evolve after she began her position as Global Associate Director, Patient Centricity, Lung Cancer. Her position was entirely "devoted to patient-focused or patient-centric marketing" "at the outset," ECF 57-4, at 185, but sometimes about 40 percent of her work was focused on healthcare provider initiatives, ECF 60-3, at 25. Hall also testified that in the fourth quarter of 2020, her "patient-centric" Tagrisso-related responsibilities constituted "40 percent" of her "time" and "effort," ECF 57-4, at 194–95, that

---

[2] Hall attempts to dispute statements in Akkinepally's declaration because, as she argues, they come from "an attorney-drafted declaration" and "[n]o documentary evidence exists" to support them. *See, e.g.*, ECF 60, at 11, 12. This argument is incorrect. She may not dispute, and the Court may not disregard, AstraZeneca's evidence merely because it comes in the form of a declaration—even if an attorney might have drafted it. Rule 56 permits the Court to consider "affidavits or declarations" when ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c)(1)(A). Hall may cite other evidence that undermines the statements in Akkinepally's declaration, but she cannot dispute them solely on the ground that they were made in a declaration.

patient-centric EGFR (a cancer gene) franchise strategy and content creation responsibilities constituted another "35 percent" of her time and effort, *id.* at 198–99, and that patient-centric marketing responsibilities constituted an additional "5 percent" of her time and effort, *id.* at 199.

Akkinepally attested that in late 2021, he determined that the Lung Cancer Commercialization Team "would be best served by adding headcount to appropriately address the increasing and shifting workstreams and implement the TLP." ECF 57-3, ¶ 19. According to Akkinepally, he met with his direct supervisor, Mohit Manrao, to request the addition of two to three individuals to his team to address these changing needs. *Id.* ¶ 20. However, after months of back and forth during which Akkinepally continuously tried "to add multiple individuals to [his] team, Manrao only assigned one additional headcount, which was achieved through eliminating a then-vacant position on AstraZeneca's Tagrisso team." *Id.* ¶ 21.

Meanwhile, Hall became pregnant in the fall of 2021. She notified Akkinepally about her pregnancy on October 1, 2021. ECF 60-27, at 2. "At the time Hall informed [Akkinepally] of her pregnancy, the considerations leading to the reorganization had been well underway for months as [Akkinepally] had begun critically evaluating the needs of the Lung Cancer Commercialization Team and the goals of the TLP since [his] initial hiring in April 2021." ECF 57-3, ¶ 31.

This period coincided with AstraZeneca returning employees to in-person work after working remotely due to the COVID-19 pandemic. *See* ECF 60-3, at 13. As AstraZeneca employees began to return to the office, Hall requested an accommodation to continue working remotely because she had elected to defer vaccination until after she gave birth to her child. ECF 57-4, at 77–78; ECF 57-45, at 99–100 (identifying Ms. Hall's work-from-home accommodation request as being lodged in "fall 2021"). Akkinepally agreed to allow Hall to continue working from home. ECF 57-4, at 78 (Akkinepally "approved that request"); *id.*, at 126 (Akkinepally

"granted that request" for Hall to work remotely). Hall submitted what she understood to be the paperwork necessary for her to continue working remotely. ECF 60-16 (accommodation request dated October 7, 2021 citing need to telework due to not being COVID-19 vaccinated on account of pregnancy). In November 2021, Colleen Heyel in HR confirmed via email that AstraZeneca had received Hall's accommodation request and the accompanying medical documentation that Hall had submitted via a third-party vendor. ECF 60-12, at 5. On December 9, 2021, however, Heyel wrote Hall that the "medical documentation does not specify any medically related conditions due to [Hall's] pregnancy[, and that] [p]regnancy itself is not an ADA disability whereas pregnancy-related medical conditions may themselves be disabilities under the ADA." *Id.* at 6. Heyel suggested instead that Hall would have to request a formal accommodation from her manager, instead of a flexible work-from-home arrangement. *Id.*

In February 2022, AstraZeneca mandated vaccination for all employees and required proof of vaccination. *Id.*, at 9. On February 15 and February 24, the Workplace Safety team notified all U.S.-based employees—including Hall—via email that any employee seeking a medical exemption from the vaccine requirement had to contact MetLife by February 28 to begin the process. *Id.* at 9–12. Hall, believing her earlier correspondence and documentation were sufficient, told the Workplace Safety team that she had "completed the medical accommodation process" with respect to the vaccination requirement. *Id.* at 12. The team responded that because she had already submitted her request, "no additional action is required at this time." *Id.*

On March 1, 2022, Akkinepally emailed Hall, asking her to send him her performance objectives for 2022. ECF 60-32, at 5. The following day, Hall sent Akkinepally an email containing her "initial stab" at 2022 goals. *Id.* at 3–4. She stated that it would be "good to talk it through together" and that she "look[ed] forward to [their] discussion." *Id.* at 3.

Akkinepally made the final decision to eliminate Hall's position in March 2022. ECF 57-3, ¶ 22. He "determined that Hall's patient-centric role should be eliminated in favor of a global marketing position expanded to focus more on [healthcare provider] marketing, with a significantly reduced focus on the existing patient-centric work." *Id.*; ECF 57-16, at 53–54. This new position was to be called "Global Marketing Associate Director, Lung Cancer." ECF 57-3, ¶ 32. In his declaration, Akkinepally stated that his decision to eliminate Hall's position came "as a last resort" and was "due to the limited headcount and shifting priorities of the TLP[.]" *Id.* ¶ 22. With Manrao's approval, Akkinepally then contacted Caroline Read, his HR Business Partner, for guidance on implementing the reorganization. *Id.* ¶ 29.

On March 28, 2022, Akkinepally forwarded to Read the email Hall had sent him on March 2 with her proposed 2022 goals. ECF 60-32, at 2. In his email to Read, Akkinepally stated:

> Hello Caroline.....Wanted to discuss this with you at our last touchbase before it got shortened.
>
> Given the deadline to enter the performance objectives in Workday by this week.....I will go ahead and ask Lise to enter her current objectives which don't reflect the needs for the position that we discussed. We can update the goals in the system after we have had a discussion with Lise, as needed.
>
> Hope this makes sense?

*Id.* The same day, Read replied, "Yes agreed and let's just get some time in with her for end of next week or the beginning of the week after, I am just conscious that time is moving on." *Id.*

Meanwhile, on April 1, 2022, the Workplace Safety team included Hall on a mass "Dear Colleague" email, informing her that her failure to upload proof of vaccination would result in termination of her employment on April 22. ECF 60-12, at 13, 23–24. Akkinepally received the same notice, immediately emailed Hall about it, and contacted Sanne Bellemans in HR on Hall's behalf. *Id.* at 15. Aside from forwarding that email and being kept apprised by Hall of some of her

communications with HR, *see id.* at 19 (email from Akkinepally to Hall saying, "Thanks for the update. I can imagine that this has been difficult for you. . . . Given the rules guiding this process, unfortunately, I am not privy to any additional details"), Akkinepally "was not involved in" any decisions related to "Hall's employment in connection with AstraZeneca's COVID-19 vaccination mandate, nor was [he] involved with the implementation or administration of that mandate," ECF 60-26, ¶ 41.

On April 1, 2022, Hall contacted HR about her vaccine exemption and work-from-home accommodation. ECF 60-12, at 16. On April 4, 2022, Heyel replied that, consistent with her December 9 email, there was no indication of "any approvals under the ADA." *Id*. Heyel explained that the prior documentation had requested only a work-from-home accommodation—not a vaccine exemption—and asked Hall to identify when she had received vaccination-exemption approval. *Id.* Hall responded that she had followed the protocol as she understood it and that she and Akkinepally were "aligned" on the issue. *Id.* HR replied that the medical documentation had requested a work-from-home accommodation because Hall was not vaccinated, which was distinct from a vaccine-exemption request, and offered a temporary accommodation that would "exhaust once [she went] out on maternity leave." *Id.* at 17. After several exchanges with HR, and after Hall submitted a letter from her physician recommending that she delay vaccination, AstraZeneca granted her a temporary accommodation on April 12, 2022, permitting remote work until her parental leave began. *Id.* at 25. Akkinepally, in consultation with Read, approved Hall's work-from-home arrangement. ECF 57-3, ¶ 42.

On April 26, 2022, Akkinepally and Read informed Hall that her role was being eliminated as part of the reorganization of the Lung Cancer Commercialization Team. *Id.* at ¶ 32. Hall was the only member of the Lung Cancer Commercialization Team whose position was eliminated as

part of this reorganization. ECF 60-1, at 12 (listing Hall's position and the vacant "Marketing Director, Tagrisso" position as the only two positions eliminated in the reorganization); *see also* ECF 60-3, at 6 ("[Hall's] role was the only role affected in that reorganization[.]"). Read and Akkinepally told Hall that AstraZeneca would give her "30 days following her maternity leave to secure a position with AstraZeneca." ECF 57-3, at ¶ 32. They invited her to apply for the new position "and explained that [they] would be supportive of her application if she was interested." *Id.*; *see also* ECF 57-20, ¶ 13 (declaration of Caroline Read stating that she and Akkinepally "invited [Hall] to apply for the [new] position").

AstraZeneca posted the new position on May 12, 2022. ECF 57-18, at 5. The job description stated, in relevant part, that the Global Marketing Associate Director, Lung Cancer position would "focus primarily on initiatives targeted at Health Care Providers (~75%) with a secondary focus on initiatives focused toward patients (~25%)." *Id.* at 3. Akkinepally testified that the person who assumed this new role would remain responsible for the LVNG With project but that "the amount of time spent on LVNG With . . . in the new role would have been a fraction of what it was previously." ECF 60-4, at 9. He also testified that the new position would no longer support the "patient work specific" to the Tagrisso team "given . . . the demands on [his] team to do . . . other work." ECF 57-17, at 99. He stated that the new position was so "significantly and materially different" from Hall's role that he could not simply tweak Hall's existing job duties to allow her to assume the new position. ECF 57-16, at 63. Instead, per his understanding of company policy, he "could not discuss it with her unless [they] posted the role," and he had to "go[] through the full recruiting process" by posting the position and soliciting applications. *Id.* at 63–64.[3]

[3] The following month, AstraZeneca formally adopted the "U.S. HR Restructuring and Redundancy Toolkit," ECF 57-5, at 2–3, which provides that a role changing by more than 30 to 40 percent should be posted as a new position and filled through the standard recruitment process,

The same day the position was posted, Read emailed Hall, cc'ing Akkinepally:

> Hi Lise –
>
> Hope you're well – just to follow up following our recent conversation regarding the change in your role.
>
> As discussed, we are happy to continue to support your position in the team for 30 days after your communicated planned return to work of October 6th 2022 – so until 5th November. As we mentioned when we spoke, we will be really happy to consider you for the new role should you be interested and apply for it.
>
> In parallel both myself and Praveen will be supportive of you with any of your attempts to look for alternative roles within the organization up through 5th November.
>
> Speak soon
> Caroline

ECF 57-19, at 2.

Hall never applied for the new position. ECF 57-3, ¶ 26; *see also* ECF 57-4, at 129 (Hall stating that "I did not apply for that position"); ECF 57-20, ¶ 13 ("Hall never applied to the open position created by the reorganization despite having access to the listing and being invited to submit an application"). Hall testified that she did not do so because she was under "a great deal of stress" while "trying to work through [her] maternity leave plan" and she was told that the new position was "a lung cancer commercialization role" rather than a patient-centric one. ECF 60-3, at 16–17. She acknowledged that she could have reviewed the job requisition but did not do so. *Id.* at 17.

Six days before beginning parental leave, Hall emailed Read and Akkinepally asking how the elimination of her position would operate given that her job-protection period under the Family Bonding Leave Policy would end around December 1. ECF 60-14, at 14. Read responded that the

---

ECF 57-7, at 13. Hardt affirmed that AstraZeneca's practices were generally consistent with the Toolkit even before the policy formally took effect. ECF 57-5, at 2–3.

job-protection period depended on the type of leave taken. *Id.* at 12. When asked what the policy provides for an employee whose position is eliminated during the job-protected period, Ingrid Bostic, the Leave and Absence Team Manager, testified that "[t]he policy does not speak to that." ECF 57-23, at 20.

Hall's parental leave began on May 18, 2022. ECF 57-20, ¶ 15. Hall gave birth on June 11. ECF 57-4, at 83. While on leave, Hall periodically asked Akkinepally and Read how AstraZeneca's leave policies applied to her circumstances. ECF 57-3, ¶ 37. Akkinepally attested that, because leave administration was outside his purview, he deferred those inquiries to Read and the HR and Employee Relations teams. *Id.* ¶ 38. Read stated that, having begun her role in December 2021 with no prior experience supporting U.S.-based AstraZeneca employees, she "routinely consult[ed]" with U.S.-based HR, Employee Relations, and Leave of Absence teams for guidance, "particularly throughout [her] first year in the role." ECF 57-20, ¶ 7.

In August, Hall emailed that she planned to take a combination of short-term disability leave, paid parental leave, and vacation leave and return to work on October 17, 2022. ECF 60-12, at 31–32. Hall also inquired about how the elimination of her position would operate in light of her job protection under the Family Bonding Leave Policy. *Id.* at 34. Akkinepally and Read met with Hall on September 30 to explain how AstraZeneca's job-protected leave would apply to her. ECF 60-21, at 2; ECF 60-14, at 5. HR calculated Hall's 26-week job-protected period to run from June 11, 2022 to December 9, 2022. ECF 60-21, at 2; *see also* ECF 57-22, ¶¶ 9, 18 (declaration of Leave and Absence Team Manager Ingrid Bostic).

While Hall was on leave, Read, in consultation with Akkinepally, twice emailed Hall listings of open positions to which she could apply. *See* ECF 57-20, ¶ 18 ("During Hall's leave, in consultation with Akkinepally and with Hall's permission, [Read] sent Hall listings of all open

AstraZeneca positions at Global Career Level F and G based in the United States on two occasions."). Hall did not apply for those positions or any other position at AstraZeneca. *Id.* ¶ 35; *see also* ECF 60-1, at 13 ("As of October 31, 2022, Plaintiff had not applied for any other position within AstraZeneca."). Akkinepally attested that he contacted two other team managers within AstraZeneca to see if they had vacancies on their teams for which Hall might be a good fit, but neither team had any positions available so he "did not share [his] efforts with Hall at that time." ECF 57-3, ¶ 36.

On October 6, 2022, Read informed Hall that her leave would end December 9. ECF 57-32, at 6. Hall replied to Read, with a copy to Akkinepally, and asked whether she had "an equivalent position to come back to if it is before or on December 9." *Id.* Read responded on October 13 that Hall's position no longer existed and that after December 9, "should we not have found you a new role, we would be looking at a redundancy package." *Id.* at 5. In an October 17 reply, Hall wrote that she had previously understood her 30-day period would begin only *after* the job-protection period ended on December 9. *Id.*

Hall, Read, and Akkinepally continued to correspond throughout October and November, including about the details of a redundancy package. On October 31, Hall wrote to Read and Akkinepally that she "could possibly be laid off in less than three weeks and still do not have the response to a question that [she had] been asking since May, when AZ made this decision." *Id.* at 4. Akkinepally replied the same day that, to his understanding, all of Hall's questions had been answered and the only outstanding item was the details of the redundancy package. *Id.* at 3. He offered to help Hall obtain answers to any other questions, but Hall informed him on November 9 that she had received the redundancy information and would follow up with any remaining questions. *Id.* at 2-4. Hall testified that, at some point, she called MetLife to request an extension

of her unpaid leave past December 9, but neither MetLife nor AstraZeneca acknowledged those requests. ECF 60-3, 32-33. Hall's last day of employment with AstraZeneca was December 9, 2022. ECF 57-20, ¶ 25.

Though Hall never applied for the new position of Global Marketing Associate Director, Lung Cancer, Emma Wilkins—a woman who was neither pregnant nor a parent at the time—did. AstraZeneca hired Wilkins for the position in September 2022. *Id.* ¶¶ 27–29.

On October 12, 2022, Wilkins sent Akkinepally the following email:

> Hi Praveen,
>
> When you get a chance would you be able to share the Patient support materials assessment deck Lise created that you mentioned during our catch-up yesterday please.
>
> Many thanks,
> Emma

ECF 60-29, at 2.

On October 21, 2022, an AstraZeneca employee named David Blumberg emailed Akkinepally that he was the "Asset Owner" of the "LVNG With" Facebook page and that he "believed [it] should be reassigned to the LVNG With program owner." ECF 60-28, at 2–3. Blumberg asked who on Akkinepally's team was "managing LVNG With" in Hall's absence. *Id.* Akkinepally replied, "Emma (copied on the email) is managing LVNG With now, please coordinate with her and she could be the Asset Owner moving forward." *Id.* at 2. Wilkins then emailed, "Thanks Praveen. Hi David, Thanks – please transfer the asset to me." *Id.*

Hall testified that Wilkins's duties in the new role mirrored her own. *E.g.*, ECF 57-4, at 129 ("someone was put into that position, and they were doing my [] duties"); *id.* at 162–63 ("AstraZeneca eliminated my position, hired someone else into a new position that they created, and then that person performed my duties"); *id.* at 175 ("[a]nother job was created in place of mine

and that person was given my duties"). Hall also testified that she did not know what percentage of Wilkins's job was "devoted to [her old] duties" and that while she knew Wilkins had taken over the LVNG With project, she did not know what other duties of hers Wilkins had assumed. *Id.* at 234. Hall admitted that Wilkins's position was "not the exact same" as her old position, *id.* at 231, and—when presented with the job description for the new position—she stated that the job was "different from . . . my role as it previously was," *id.* at 278.

In November 2023, Akkinepally transitioned to another role, Head of the Oncology Business Unit, at AstraZeneca's offices in India. ECF 57-3, ¶ 3. He subsequently hired three employees, none of whom was pregnant or required leave to care for children at the time. ECF 60-4, at 15–18. The following year, Wilkins, who became pregnant after she was hired into the new position, took 52 weeks of maternity leave. ECF 57-40. Read attests that Wilkins "has not suffered any adverse action following her utilization of maternity leave." ECF 57-20, ¶ 29.

In her sworn answers to interrogatories, Hall stated she was "unaware of any" "employee outside of [her] sex who [she] believe[s] was treated in a more favorable manner" than she was. ECF 57-37, at 3.

On September 20, 2023, Hall filed this lawsuit in the Circuit Court of Montgomery County, Maryland, against AstraZeneca and Akkinepally. AstraZeneca removed the case to this Court on September 28, 2023. ECF 1, at 2. Hall filed an amended complaint on March 25, 2024. ECF 21. In her amended complaint, Hall brought four counts: sex discrimination, including pregnancy discrimination, in violation of MCC § 27-19(a) (Count I); family responsibilities discrimination in violation of MCC § 27-19(a) (Count II); failure to pay wages in violation of the Maryland Wage Payment and Collection Law (Count III); and sex and pregnancy discrimination in violation of the MFEPA (Count IV). *Id.* at 9–13. Hall subsequently dismissed Akkinepally as a defendant. ECF 36.

AstraZeneca moved for summary judgment on all counts. ECF 57. During a hearing on the motion, the Court granted summary judgment on Count III. ECF 75. Today, the Court grants summary judgment on Counts I, II, and IV to AstraZeneca as well.

## II. Standard of Review

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 252. The court "should not weigh the evidence." *Perkins*, 936 F.3d at 205. However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (citation modified). In ruling on a motion for summary judgment, the court "view[s] the facts and inferences drawn from the facts in the light most favorable to the nonmoving party." *Id.* (citation modified).

## III. Discussion

AstraZeneca moves for summary judgment on Hall's Maryland Fair Employment Practices Act and Montgomery County Code claims.

The MFEPA prohibits employers from discriminating against employees because of sex, Md. Code Ann., State Gov't § 20-606(a), and it requires employers to provide reasonable accommodations to pregnant employees, *id.* § 20-609. The MCC bars employers from discharging individuals because of sex or family responsibilities. MCC § 27-19(a)(1)(A). Sex discrimination under the MCC includes discrimination "because of . . . pregnancy, childbirth, or related medical conditions." *Id.* § 27-6.

Discrimination claims under the MFEPA and the MCC are analyzed under the same framework as employment discrimination claims under Title VII of the Civil Rights Act of 1964. *See Barreto v. SGT, Inc.*, 826 F. App'x. 267, 270 (4th Cir. 2020) (evaluating MFEPA claim under Title VII framework); *Weisman v. Md.-Nat'l Cap. Park & Plan. Comm'n*, No. GLR-24-009, 2024 WL 3757912, at *2 n.2 (D. Md. Aug. 12, 2024) (applying Title VII framework to MFEPA and MCC claims).

An employment discrimination plaintiff bears the burden of proving that the defendant discriminated against her "because of a protected characteristic." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998). The burden of proof may be satisfied by "direct evidence or by circumstantial evidence." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1314 (4th Cir. 1993). Hall alleges no direct evidence of discrimination. She relies solely on circumstantial evidence. Without any evidence of direct discrimination, Hall's discrimination claims proceed under the *McDonnell Douglas* burden-shifting framework. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

At the first step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of employment discrimination. *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). To do so, the plaintiff must show that: "(1) [s]he belongs to a protected class;

(2) [s]he suffered an adverse employment action; (3) at the time of the adverse action, [s]he was performing h[er] job at a level that met h[er] employer's legitimate expectations . . . ; and (4) [s]he was [subjected to an adverse employment action] under circumstances giving rise to an inference of unlawful discrimination." *Adams v. Trs. of the Univ. of N.C.*, 640 F.3d 550, 558 (4th Cir. 2011).

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to produce evidence showing a legitimate and non-discriminatory reason for the adverse employment action. *Guessous*, 828 F.3d at 216. The burden then returns to the plaintiff to demonstrate by a preponderance of the evidence that the stated reason is pretext for discrimination. *Id.* "She may succeed in this either by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). To survive summary judgment, "the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." *Gillins v. Berkeley Elec. Co-op., Inc.*, 148 F.3d 413, 417 (4th Cir. 1998) (quoting *Vaughan v. Metrahealth Cos.*, 145 F.3d 197, 201–02 (4th Cir. 1998)).

**A. Prima Facie Case**

Hall has submitted evidence to establish the first three prongs of a prima facie case. She was a member of a protected class because she is a woman, was pregnant, and was raising a newborn during the relevant period. *See* Md. Code Ann., State Gov't § 20-606(a)(1)(i); MCC §§ 27-6, 27-19(a). Hall was subjected to adverse employment actions because her position was eliminated and her employment was terminated. *See, e.g.*, *Guessous*, 828 F.3d at 217 (recognizing elimination of position and termination as adverse employment actions). And there is evidence that

Hall was meeting AstraZeneca's legitimate expectations. *See* ECF 57-6, at 57 (Hardt testimony reporting no recollection of a negative performance review or disciplinary action in Hall's personnel file); ECF 57-17, at 30 (Akkinepally testimony that he had no problem with Hall's performance).

Hall's prima facie case falls apart at the fourth element. Hall has not identified evidence from which a reasonable juror could conclude that her position was eliminated or that her employment was terminated under circumstances giving rise to an inference of unlawful discrimination. Even though making out a prima facie case of discrimination is "a relatively easy test to surpass," *Hood-Wilson v. Bd. of Trs. of Cmty. Coll. of Balt. Cnty.*, 162 F.4th 101, 105 (4th Cir. 2025) (citation modified), Hall has not surpassed it. Before discussing the proffered evidence of unlawful discrimination, the Court must identify the proper analytical framework for evaluating it.

"The scheme of proof originally articulated in *McDonnell Douglas* . . . for establishing a prima facie case by circumstantial evidence is not a precise, mechanically-imposed formulation." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993). As the *McDonnell Douglas* Court itself noted, the circumstances that may give rise to an inference of unlawful discrimination vary in "differing factual situations." *See* 411 U.S. at 802 n.13. "In each set of circumstances, the burden is on the plaintiff to prove a set of circumstantial facts, which . . . leads one to conclude with reasonable probability that the action taken against [them] was the product of discrimination." *Cook*, 988 F.2d at 512.

In an ordinary discriminatory discharge case, a plaintiff may satisfy the fourth prong of a prima facie case by showing that "the position was filled by a similarly qualified applicant outside the protected class." *Guessous*, 828 F.3d at 219 (citation modified); *Bonds v. Leavitt*, 629 F.3d 369,

386 (4th Cir. 2011). That typical analytical framework does not work here. AstraZeneca did not discharge Hall and fill her position with someone else. Rather, AstraZeneca eliminated Hall's position as part of a corporate reorganization, created a new position, and hired another woman who was not pregnant and did not have family responsibilities to fill the new position. Thus, this "is not a typical discriminatory discharge case, where a putatively poor-performing employee is terminated and replaced by someone outside the protected class." *See Guessous*, 828 F.3d at 219.

This case is "closer to a reduction-in-force case, where unnecessary positions are eliminated." *See id*. In such cases, the plaintiff must show "that her job duties were absorbed by employees not in the protected class or otherwise show that [her employer] did not treat [her] protected characteristics neutrally when deciding to terminate her." *Id*. at 219–20 (citing *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 690 n.1 (7th Cir. 2006) (explaining that, in a case involving the elimination of only one position, "[t]he retention of an employee outside the protected class to perform the plaintiff's duties is nothing more than a demonstration of more favorable treatment")).

The Fourth Circuit applied this adaptation of the fourth prong of the prima facie case in *Guessous*, a single-employee reduction-in-force ("RIF") case. There, the discharged plaintiff's position "was not filled by any new hire"; the employer "shifted her work duties to" other employees. *Id.* at 215. The Fourth Circuit held that the plaintiff had established a prima facie case of discrimination because it was undisputed that, after she was fired, all of her "duties were absorbed by" employees outside her protected class. *Id*. at 219–20.

Before *Guessous*, the Fourth Circuit took a "modified" approach in another single-employee RIF case. *See Blistein v. St. John's College*, 74 F.3d 1459, 1470 (4th Cir. 1996), *overruled on other grounds by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998), *as recognized by Adams v. Moore Bus. Forms, Inc.*, 224 F.3d 324, 327 (4th Cir. 2000). In *Blistein*, after the plaintiff

was discharged, "some of" his duties were assumed by several employees "who were themselves within the protected class," and some duties were not assumed by anyone. *Id*. On those facts, the Fourth Circuit held that the plaintiff could establish the fourth element of a prima facie case "either by showing that comparably qualified persons outside the protected class were retained in the same position *or* by producing some other evidence indicating that the employer did not treat [the protected trait] neutrally in deciding to eliminate the plaintiff's position." *Id*. (citation modified).

Though neither *Guessous* nor *Blistein* fits the facts of this case perfectly, the Court applies their analytical framework here because this case more closely resembles a single-employee RIF case than any other type of discriminatory discharge case.

Here, there is no dispute that Hall's eliminated position was not identical to the position that Wilkins filled. Thus, Hall cannot prove that a comparably qualified person outside of her protected class was "retained in the same position." *See Blistein*, 74 F.3d at 1470. Nor can Hall prove that *all* her duties were absorbed by employees outside her protected class. *See Guessous*, 828 F.3d at 219. The record shows that not all of Hall's duties were absorbed by Wilkins. The question, then, is whether Hall has submitted evidence that her responsibilities were "functionally equivalent" to Wilkins's responsibilities such that a reasonable juror could conclude that eliminating Hall's position and hiring Wilkins for essentially the same position was evidence of discrimination. *See Burgess v. Bowen*, 466 F. App'x 272, 278–79 (4th Cir. 2012) (holding that plaintiff can establish "she was replaced by someone outside her protected class" with evidence "tending to show that the [old and new] positions were intended to be functionally equivalent").[4]

[4] Although the Fourth Circuit in *Burgess* did not characterize the case as a single-employee RIF case or state it was using the fourth-prong framework used in *Guesseous* or *Blistein*, the court's analysis of the circumstances giving rise to an inference of unlawful discrimination was similar to those cases, and the facts are similar to the facts here. In *Burgess*, the Black plaintiff's position was eliminated, and her employer created a new position and hired a white woman to fill it. 466 F.

Jobs are functionally equivalent when they have "the identical title, responsibilities, and salary" or when the new role has "most of the [same] responsibilities" as the eliminated role. *Id*. Jobs are not functionally equivalent when "the differences between two written job descriptions are so stark such that it cannot be said that the first position remained open to similarly qualified applicants." *Id.* (citation modified); *see also Murray v. Gilmore*, 406 F.3d 708, 711, 714 (D.C. Cir. 2005) (positions were "functionally equivalent" where "they both had the [sic] reporting to the head of the Agency; they both had overall responsibility for the Office of Public Information; they both were responsible for supervising the employees in that office; and . . . they each were the chief spokesperson." (citation modified)); *Gaworski v. ITT Com. Fin. Corp.*, 17 F.3d 1104, 1109 (8th Cir. 1994) (terminated employee in mass-RIF case established prima facie case where replacement inherited terminated employee's office, "substantially all of [terminated employee's] former duties," a "fairly comparable" job description, and an "almost identical" title); *Dunn v. Hunting Energy Servs.*, 288 F. Supp. 3d 749, 772–73 (S.D. Tex. 2017) (finding no prima facie case of discrimination where plaintiff and comparator's written job descriptions had "some overlap" but were "clearly not nearly identical"); *Waldrop v. Science Apps. Int'l Corp*, No. AW 10 00328, 2011 WL 4025410, at *4 (D. Md. Sept. 9, 2011), *aff'd*, 473 F. App'x 220 (4th Cir. 2012) (per curiam) (finding position not "filled by similarly qualified applicants" where terminated employee's "duties [were] absorbed by [a superior] as 20–to–30 percent of his workload"). And even when written job descriptions are "overlapping" or share "similarities," there may be other

App'x at 278. In analyzing whether the plaintiff had established a prima facia case, the *Burgess* court compared the duties of the plaintiff's eliminated position with the duties of the new position. *Id.* at 279. *Burgess* found that "the transfer of most of the [eliminated role's] responsibilities to the [new] position" was "itself sufficient to meet [the plaintiff's] burden" of establishing a prima facie case. *Id.*

evidence that "that the core duties of each position are very different." *Schauer v. Emerge, Inc.*, No. CCB-22-cv-731, 2023 WL 5297745, at *5 (D. Md. Aug. 16, 2023) (citation modified).

Hall's position was Global Associate Director, Patient Centricity, Lung Cancer. Hall's role was primarily patient-centric. The requisition for Hall's job stated that she was "responsible for the development and implementation of patient centric strategies and solutions to enhance the patient journey for people living with lung cancer." ECF 57-12, at 3. Hall's responsibilities included developing "new patient solutions to address . . . barriers [and] opportunities in the lung cancer journey"; managing the "global online community[] LVNG with Lung Cancer"; "[d]evelop[ing] and implement[ing] patient marketing strategy for Tagrisso"; and developing a "patient centricity framework." *Id.*at 4. Akkinepally testified that a "significant proportion of [Hall's] responsibilities were focused on patients." ECF 57-17, at 78. Hall testified similarly. For example, in the last quarter of 2020, Hall's "patient-centric" Tagrisso-related responsibilities constituted "40 percent" of her time. ECF 57-4, at 194–95, 197. Hall's EGFR (a cancer gene) franchise strategy and content creation responsibilities were "patient-centric" and constituted "35 percent" of her time. *Id.* at 198–99. And Hall's "patient-centric" marketing responsibilities constituted "5 percent" of her time. *Id.* at 199.

In the reorganization of the Lung Cancer Commercialization team, Akkinepally "determined that Hall's patient-centric role should be eliminated in favor of a global marketing position expanded to focus more on [healthcare provider] marketing, with a significantly reduced focus on the existing patient-centric work." ECF 57-3, at 6 ¶ 22.

The new position was Global Marketing Associate Director, Lung Cancer. This position was primarily provider-centric. The requisition for the new position stated that the role "focus[ed] primarily on initiatives targeted at Health Care Providers (~75%) with a secondary focus on

initiatives focused towards patients (~25%).” ECF 57-18, at 3. AstraZeneca posted the new position and solicited applications, in accordance with company policy for roles that have changed by more than 30 to 40 percent. ECF 57-7, at 13; ECF 57-5, at 3–4. Wilkins—a woman who was not pregnant or a parent at the time—applied for and was selected for the new role. Hall acknowledged that Wilkins’s position was “not the exact same role” as hers, ECF 57-4, at 231, and that it was “different from [her] role as it previously was,” *id.* at 278.

True, as Hall argues, some of her duties were assumed by Wilkins. For example, Wilkins managed the LVNG With program, one of Hall’s responsibilities. *See* ECF 60-28, at 2. Yet after Hall’s position was eliminated in the reorganization, the LVNG With project was scaled down and constituted only a small part of Wilkins’s job responsibilities. ECF 60-4, at 9 (time spent on LVNG With was “fraction of what it was previously”). Also, Wilkins’s role retained some of Hall’s patient-centric duties. ECF 57-18, at 3 (patient-centric work accounted for 25 percent of responsibilities); ECF 60-29, at 2 (email from Wilkins to Akkinepally asking him “to share the Patient support materials assessment deck [Hall] created”). And Wilkins did maintain involvement in some of the Tagrisso-related initiatives that Hall was responsible for, despite the provider-centric focus of Wilkins’s job and the team’s move away from Tagrisso-related work after the reorganization. ECF 63 (slide deck created and presented by Wilkins identifying Tagrisso-related priorities). While there certainly was some overlap between the responsibilities of Hall’s eliminated position and the new position filled by Wilkins, the undisputed evidence shows that Wilkins absorbed only some of Hall’s responsibilities, that the absorbed responsibilities were a small percentage of Wilkins’s overall responsibilities, and that Wilkins’s job was primarily provider-focused, whereas Hall’s job was primarily patient-focused.

In other discriminatory discharge cases—some single-employee RIF cases and others discharge-and-replace cases—courts have held that evidence of some duties being assigned to employees outside the protected class was insufficient to show the employee was terminated under circumstances giving rise to an inference of unlawful discrimination. *See Waters v. Logistics Mgmt. Inst.*, 716 F. App'x 194, 197 (4th Cir. 2018) (affirming grant of summary judgment for employer in terminate-and-replace case where "some of" terminated employee's duties were assigned to others and the role was ultimately eliminated); *Waldrop*, 2011 WL 4025410, at *3–4 (granting summary judgment for employer where female employee's "position was eliminated" and her duties were absorbed by a male employee "as 20–to–30 percent of his workload"); *Farley v. CMFG Life Ins.*, No. 6:22-cv-24, 2023 WL 3628277, at *5–6 (W.D. Va. May 24, 2023) (applying *Guessous*'s mini-RIF framework and granting summary judgment for employer where "many" but not all of the terminated employee's responsibilities were absorbed by others and only one of the others—who only "took on certain limited administrative tasks"—was outside the plaintiff's protected class); *Blistein*, 74 F.3d at 1470 (affirming grant of summary judgment, in part, because only "some of" the terminated employee's duties were absorbed by others).

As in these cases, Hall has not offered any evidence that her eliminated position was the functional equivalent of the newly created position that Wilkins was hired to fill. The "written job descriptions" are so starkly different "such that it cannot be said that" Hall's position "remained open to similarly qualified applicants." *See Burgess*, 466 F. App'x at 279. And the other evidence—Hall's testimony, the testimony of AstraZeneca employees, and internal AstraZeneca documents—also show that Hall's position did not remain open. No reasonable juror could find that Wilkins essentially was performing Hall's job under the guise of a new title.

That does not end the fourth prong inquiry. The Court must consider whether Hall has produced any evidence indicating that AstraZeneca did not treat her protected traits "neutrally" when it decided to eliminate her position. *See Guessous*, 828 F.3d at 219; *Blistein*, 74 F.3d at 1470. The focus here is on the "relevant decisionmaker." *Barnhill v. Bondi*, 138 F.4th 123, 131 (4th Cir. 2025). Hall must establish that Akkinepally, the relevant decisionmaker, "was motivated by" Hall's protected traits when he eliminated her position. *See id.* at 131. Here, too, Hall fails to meet her burden.

Hall points to the fact that, after Akkinepally moved to India to be the Head of the Oncology Business Unit, he hired three employees who reported directly to him and none of them was pregnant or required leave to care for children at the time. ECF 61, at 21. True, evidence that a decisionmaker, "soon after" firing an employee, hired others outside the employee's protected class for the same position may suggest unlawful discrimination. *See Hallquist v. Loc. 276, Plumbers & Pipefitters Union*, 843 F.2d 18, 24–25 (1st Cir. 1988). But Hall submits no such evidence. Akkinepally's hiring practices for three different positions in a different AstraZeneca division in another country—more than a year and a half after Hall's position was eliminated and a year after her employment was terminated—hardly support an inference of unlawful discrimination. As Hall herself admitted under oath in her interrogatory responses, she was "unaware of any individuals outside of [her] sex who [she] believe[s] w[ere] treated in a more favorable manner" than she was. ECF 57-37, at 3. Hall has not identified any actions or words of Akkinepally suggesting he did not act neutrally when he eliminated her position.

In fact, the record evidence indicates that Akkinepally *did* act neutrally. Akkinepally began to reorganize his team "months" before Hall informed him that she was pregnant. ECF 57-3, ¶ 31; ECF 57-16, at 14 (process of deciding to eliminate Hall's position began when Akkinepally's role

was created in April 2021). And after he learned Hall was pregnant, Akkinepally tried to grow the number of positions on the team, not eliminate them. He asked for an additional two or three people to be assigned to the team. ECF 57-3, ¶ 20. When that request was denied, Akkinepally continued to try "to add multiple individuals to [his] team," but his efforts were unsuccessful. *Id.* ¶¶ 20–21. Approximately five months later, and only "as a last resort and due to the limited headcount," Akkinepally decided in March 2022 to eliminate Hall's role. *Id.* ¶ 22. On April 26, Akkinepally informed Hall that her position was being eliminated and that a new provider-centric role was being created. *Id.* ¶ 32. Akkinepally "invited" Hall to apply for new position "and explained that [he] would be supportive of her application if she was interested." *Id.* The record evidence shows that Akkinepally acted neutrally when he made the decision to eliminate Hall's position.

Hall argues that the "temporal proximity between [her] activities to support her newborn child and the subsequent adverse action allows this Court to infer discrimination" because of her family responsibilities. ECF 60, at 22. As Hall tells it, "AstraZeneca's adverse actions began shortly after she requested a temporary exemption from AstraZeneca's COVID-19 vaccination mandate due to her pregnancy[,]" a request she made the same week she informed Akkinepally she was pregnant. *Id.* Hall claims she received "conflicting" and at times "threatening" communications from HR in response to questions about her vaccine exemption and work-from-home status—both of which she enjoyed because she was pregnant. ECF 60, at 22–23. For instance, on April 1, 2022, Hall received a mass "Dear Colleague" email threatening that her failure to upload proof of vaccination would result in termination of employment on April 22. ECF 60-12, at 13, 23–24. Hall also received conflicting (or at least opaque) guidance about whether she should be seeking an ADA accommodation or a flexible work arrangement in order to work from home, *see* ECF 60-12, at 5–6, and whether and for how long she had job-protected leave under the

Family Bonding Leave Policy, *see* ECF 57-32, at 4 (stating that she "still do[es] not have the response to a [job protection] question that [she had] been asking since May"). Hall argues that this "conflicting" and "threatening" correspondence with HR occurred in the weeks before she learned her position was being eliminated and "just weeks before her planned maternity leave." ECF 60, at 22–23. This timing, Hall argues, suggests her position was eliminated because she was pregnant and about to take parental leave. Hall's arguments fail for several reasons.

Hall's invocation of "temporal proximity" to show an inference of unlawful discrimination under these facts is improper. Temporal proximity is commonly used in retaliation cases to show that a plaintiff's engagement in protected activity occurred so close in time to a subsequent adverse action that a trier of fact could infer a causal connection between the protected activity and the adverse action. *See, e.g.*, *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218–19 (4th Cir. 2022). Retaliation cases, including the case Hall cites, *Kasmir v. Retail Servs. & Sys.*, 330 A.3d 755 (Md. App. Ct. 2025), are not particularly relevant here because this is a discriminatory discharge case, not a retaliation case.

In discriminatory discharge cases, some courts have considered "temporal proximity" when deciding whether a plaintiff has shown an inference of discrimination at the prima facie stage. *See, e.g.*, *Gamble v. Fieldston Lodge Nursing & Rehab. Ctr.*, 697 F. Supp. 3d 112, 121 (S.D.N.Y. 2023) (drawing inference of discrimination when only three months transpired between employer learning employee was gay and termination); *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006) ("[T]emporal proximity between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee . . . may be indirect evidence in support of an inference of pregnancy discrimination[.]" (citation modified)).

Though Hall refers to "temporal proximity" in her briefing, she does not argue that the temporal proximity between her disclosure to Akkinepally that she was pregnant (October 1, 2021) and his decision to eliminate her position (March 2022) would permit a reasonable juror to infer that he eliminated her position because she was pregnant and about to take parental leave. Perhaps Hall did not make this argument because no facts support it. In the five months between the disclosure of her pregnancy and the decision to eliminate her position, there is no evidence that Akkinepally's decision was motivated by bias against Hall's pregnancy or family responsibilities. In fact, the evidence indicates that Akkinepally supported Hall. After Hall told Akkinepally that she was pregnant and informed him that she was going to defer receiving her COVID-19 vaccine until after she gave birth, she asked to continue working remotely until her leave started, which Akkinepally approved. During the last quarter of 2021 and first quarter of 2022, while Akkinepally was changing his team's focus, he tried to expand the number of people under him and avoid eliminating any positions. Only after those efforts failed did Akkinepally decide he had to eliminate Hall's position. From these facts, no reasonable jury could infer Hall's pregnancy or family responsibilities factored into Akkinepally's decision to eliminate her position. Hall's attempt to invoke "temporal proximity" to show unlawful discrimination fails.[5]

The Court nonetheless considers whether Hall's cited evidence gives rise to an inference of unlawful discrimination. It does not. As a threshold matter, the Human Resources employees

---

[5] In Hall's opposition brief, she suggests that her receipt of "several threatening emails" "caused [her] significant stress during her pregnancy," ECF 60, at 22–23, and she vaguely refers to the emails as part of a "pattern of adverse actions." *Id*. at 23. It is unclear whether Hall is arguing that the emails themselves are adverse actions. She did not plead them as adverse actions in her complaint. And even if she had, claims of "hostile treatment" generally do not constitute adverse employment actions. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019). The only adverse actions in this case are the elimination of Hall's position and the termination of her employment.

who emailed Hall played no role in deciding to eliminate Hall's position. That was Akkinepally's decision. *See Barnhill*, 138 F.4th at 130–31 (adverse actions must "stem[] from . . . discriminatory animus [of the] relevant decisionmaker"). Setting aside that fatal flaw in Hall's position, the emails do not show discriminatory animus. They show a network of staff doing their best to accommodate Hall's requests arising from her family responsibilities by granting her work-from-home accommodations and a vaccination exemption without a standard operating procedure for how to handle these requests in the middle of a once-in-a-lifetime global pandemic. They also show that Akkinnepally—when he became of aware of the issues Hall was having with HR—tried to help her resolve them. When Hall received the April 1, 2022 mass "Dear Colleague" email threatening termination if proof of vaccination was not uploaded, Akkinepally immediately tried to help Hall, who had an authorized vaccine exemption, and within days, Hall was given a temporary accommodation. These emails do not show any AstraZeneca employee, let alone the relevant decisionmaker, harbored discriminatory animus towards Hall. *See McDonnell v. Schindler Elevator Corp.*, No. 12–CV–4614 (VEC), 2014 WL 3512772, at *14 (S.D.N.Y. July 16, 2014) ("email traffic" threatening that employees who fail to submit medical documentation by a certain date "will be subject to discipline up to and including termination" merely "reveal[] a company dealing with a problem [], not discriminatory intent").

Hall has not presented any evidence from which a reasonable juror could conclude that her position was eliminated under circumstances of unlawful discrimination.

Turning to the other adverse action—the termination of Hall's employment—the Court considers whether Hall has established a prima facie case of unlawful discriminatory discharge. She has not.

Recall that, on April 26, 2022, when Hall was informed her position was being eliminated, she was advised that she had until 30 days after her parental leave ended to secure a new position with AstraZeneca. Hall started parental leave on May 18, 2022, and she had her baby on June 11, 2022. Hall was eligible for job-protected leave until December 9, 2022. While Hall was on leave, Read twice sent her listings of open positions at her level. Hall did not apply for a single position. Hall's employment with AstraZeneca was terminated on December 9, 2022, at the end of her job-protected leave, pursuant to company policy.

As evidence that she was terminated under circumstances giving rise to an inference of unlawful discrimination, Hall cites the litany of evidence discussed above concerning how AstraZeneca employees handled her request for a vaccine exemption and her related request to work from home because she was not vaccinated. If that evidence did not support an inference of discriminatory animus driving the decision to eliminate her position in April, it certainly does not support an inference of discriminatory animus driving the decision to terminate her employment eight months later.

Hall also claims that, while she was on leave, AstraZeneca "continued its pattern of obstructive behavior by providing inconsistent and conflicting guidance about when Hall's 30-day job search period would begin and end." ECF 60, at 23 (citing Exhibits 1, 2, 3, 17, and 21). The evidence Hall cites—emails between her and members of AstraZeneca's HR team and related deposition testimony—shows that Hall asked HR about the company's Family Bonding Leave policy; how the 30-day support period after her job-protected leave aligned with the guarantee of 26 weeks of job protection; whether she was entitled to an additional 26 weeks of non-protected leave; and whether she could apply for a new position within those additional 26 weeks. To be sure, there was some confusion about the answers to Hall's questions, but HR responded and

provided answers. While Hall may view HR's responses as "inconsistent" and its guidance "conflicting," *id.*, nothing in the evidence Hall cites suggests HR or anyone at AstraZeneca provided inconsistent answers or conflicting guidance—or bore any discriminatory animus whatsoever towards her—because of her family responsibilities.

Hall has not identified any evidence that her employment was terminated under circumstances giving rise to unlawful discrimination.

**B. Pretext**

Because Hall has not made out a prima facie case of discrimination, the Court need not consider whether Hall has produced evidence showing that AstraZeneca's non-discriminatory reasons for eliminating her position and terminating her employment are pretext for discrimination. Nevertheless, the Court addresses Hall's pretext arguments because they confirm there is no evidence of unlawful discrimination here.

After a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to produce evidence showing a legitimate and non-discriminatory reason for the adverse employment action. *Guessous*, 828 F.3d at 217. AstraZeneca has met this burden. It has produced evidence that Hall's position was eliminated because Akkinepally's team was redirecting its efforts away from patient-centric work and towards provider-centric work and the team could no longer support Hall's work for the Tagrisso team. AstraZeneca also has produced evidence that it terminated Hall's employment months after her position was eliminated because Hall did not apply for a new position and her job-protected leave ended per company policy. These are a legitimate, non-discriminatory reasons for the adverse employment actions.

Hall, in turn, must demonstrate that these reasons are pretext for discrimination "by showing that [they are] unworthy of credence." *See Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 143 (2000) (citation modified); *see also Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995) (plaintiff must show purported reason for firing was "a sham"). On "the issue of whether the defendant's explanation is pretextual," the jury "may [] consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." *Reeves*, 530 U.S. at 143 (citation modified).

Starting with the elimination of Hall's position, Hall's primary pretext argument is a rehash of her argument that "Wilkins essentially assumed Hall's responsibilities under a different title." ECF 60, at 26. For the reasons explained earlier, no reasonable juror could conclude that Wilkins effectively took over Hall's position and that the real reason for eliminating Hall's position was because she was pregnant or had new family responsibilities.

Hall also questions the legitimacy of Akkinepally's stated reason for eliminating her position. Hall argues that, despite AstraZeneca's claim that her position was eliminated so that Akkinepally's team could focus more on provider-centric work, "Akkinepally admitted under oath [in his deposition] that no new initiatives were created since April 2021 that would demonstrate this purported shift in focus." *Id.* at 13. That is not what Akkinepally testified. In the portion of Akkinepally's deposition that Hall cites, Hall's counsel presented Akkinepally with a slide from an internal presentation containing several TLP initiatives for 2023, the year after Hall was terminated. ECF 57-16, at 19. This led to the following exchange:

> Q: Okay. So which initiative that's listed on this page has been newly created since April of 2021?
>
> A: I do not recollect exactly which ones were newly created. And also, let me clarify that even if the name of an initiative was similar, the scope of many of these initiatives could have significantly changed. So some of these could be the same in name only because as part of the tumor leadership plan, a lot of the scope and focus and priorities were being redefined. So again, when you say new, I don't know exactly how you're defining new, but this was the context in which the plan was being built.

> Q: Okay. Then out of these, which initiatives has [sic] been redefined since April 2021?
>
> A: My recollection is almost all of them were redefined since April 2021.
>
> Q: Okay. So let's start with the LC Care Companion Best Practice Platform. How is this initiative redefined since April 2021?
>
> A: As I remember, and as I was mentioning earlier, I do not specifically remember whether this even existed before 2021, because again, I'm going by memory from three years back so sir, please bear with me. So I do not exactly remember if this even existed before. . . . So my understanding is this was something that was built as a result of our focus at the tumor level and bringing all of this together, which was an entirely new work stream. And that is my recollection of how this was built, so I do not recollect if it even existed before.

*Id.* at 21–22. At no point during this exchange did Akkinepally "admit" that no new initiatives had been created since April 2021. He stated that almost all initiatives had been redefined; added that he could not recall which initiatives were newly created; and expressed doubt as to whether at least one initiative had even existed before April 2021.

Next, Hall argues that record evidence undercuts AstraZeneca's assertion that Akkinepally's team could no longer support Hall's work on the Tagrisso team. For support, [redacted]. ECF 61, at 14. But that evidence is neither here nor there. The fact that [redacted] after Hall's position was eliminated does not say anything about whether *Akkinepally's* team—which was distinct from the Tagrisso team—had the capacity to support its work.[6]

Finally, Hall argues that, even if there was an actual change in the business needs of Akkinepally's team, there is a dispute of fact about whether "this change required eliminating [her] position." ECF 60, at 25. As Hall sees it, because she previously performed provider-centric responsibilities "for up to 40% of her time," *id.*, Akkinepally's claim that he could not modify her

[6] The redacted information was filed under seal. *See* ECF 75 (granting motion to seal). The Court has filed an unredacted version of this memorandum opinion under seal.

position to meet the change in business needs without fundamentally altering Hall's position should be disbelieved.[7] Here, Hall asks the Court to enter forbidden territory. "[W]hen an employer gives a legitimate, non-discriminatory reason for" an adverse action, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citation modified). Akkinepally offered a legitimate non-discriminatory reason for eliminating Hall's position: a shift in his team's focus and priorities from patient-centric to provider-centric work. Even if Akkinepally was incorrect in his assessment that his team's business needs could not be met unless he fundamentally altered Hall's position, his incorrect assessment does not cast doubt over the veracity of his stated reason for eliminating Hall's position. The Court will not "second-guess" whether Akkinepally's "business decision" was correct when there is no evidence that he lied about the reason for eliminating Hall's position. *See Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) (citation modified). Hall has not identified any evidence that Akkinepally's reason for eliminating Hall's position "is unworthy of credence," *see Reeves*, 530 U.S. at 143, or that a "discriminatory reason more likely motivated," *see Burdine*, 450 U.S. at 256, the decision.

As for her termination, Hall does not argue that the reason she was terminated is not true. That, on its own, should end the Court's pretext analysis.

---

[7] In support of this argument, Hall cites a March 28, 2022 email from Akkinepally to Read, in which Akkinepally said, "I will go ahead and ask Lise to enter her current obligations which don't reflect the needs for the position that we discussed. We can update the goals in the system after we have had a discussion with Lise." ECF 60-32, at 2. Hall argues this email undermines AstraZeneca's proffered reason for eliminating her position. It does not. Even when viewed in the light most favorable to Hall, this email suggests, at most, that there was overlap between Hall's position and the new position that Akkinepally created to meet his team's needs. It does not call into question the veracity of the stated reason for eliminating her job.

Rather than try to show AstraZeneca's reason for her termination was untrue, Hall blames AstraZeneca for her failure to apply for a single job before her job-protected leave ended. Hall argues that "AstraZeneca's actions . . . lead [sic] to Hall's failure to apply for a position during this time." ECF 60, at 26. Hall proceeds to reassert the same arguments about "confusing and delayed communications" with HR that she made in support of the fourth prong of the prima facie case. *Compare id.* at 22–23, *with id.* at 26–29. Those arguments (and the evidence Hall cites) are no more convincing at the pretext stage than they were at the prima facie stage.

Hall claims that the proffered reason for her termination "shows general animus towards employee[s] with family responsibilities which this court can attribute to the decisionmaker." *Id.* at 27 (citing *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300–01 (4th Cir. 2010)).[8] Hall argues that during the period she was expected "to be actively job searching, she was recovering from giving birth as a solo mother to her child at 49 years old via cesarean [sic] section where she experienced severe pre-eclampsia and severely elevated blood pressure." *Id*. at 27–28. As Hall sees it, "AstraZeneca's expectation that Hall should have simultaneously engaged in an active job search during this period is inconsistent with the purpose of family bonding leave and reveals AstraZeneca's discriminatory animus." *Id*. at 28. Hall makes a compelling case for how difficult it is for a woman to be a solo mother, especially one whose pregnancy was challenging,

[8] *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289 (4th Cir. 2010), is a far cry from this case. There, the Fourth Circuit attributed to a decisionmaker the anti-female statements of male corporate executives and managers of a trucking company because those statements "evinced a very specific yet pervasive aversion to the idea of female Pickup and Delivery drivers." *Id.* at 300. One "operations' manager stated, '[t]his is not a woman's place.'" *Id.* at 301. Another manager "forthrightly acknowledged the company's reluctance to hiring female Pickup and Delivery drivers, noting that 'the company did not really have women [Pickup and Delivery] drivers,'" and that the plaintiff "was passed over because 'it was decided that [the company] could not let a woman have that position.'" *Id.* These blatantly discriminatory statements by several high-level employees at the company fairly evinced a discriminatory "corporate culture" that is nowhere to be found in the record before this Court. *Id.* at 300.

and to apply for a job while caring for a newborn on her own. But that compelling case does not help Hall prove discriminatory intent. Hall has not produced any evidence showing the stated reason for her termination—her failure to obtain a position within the company from April 26, 2022, when she learned her position had been eliminated, until December 9, 2022, when her job-protected leave ended—was not the true reason she was terminated.

Hall argues that the "confusing and delayed communications" with HR, combined with AstraZeneca's failure to follow its own policies and procedures, are evidence of discriminatory intent. *Id.* at 28. Hall has not cited any procedure or policy violation that suggests AstraZeneca terminated her position because of her family responsibilities. The record shows that HR employees were trying to comply with company policies and provide the correct answers to her questions. Even if AstraZeneca's guidance to Hall about her protected leave end date was at times confusing and delayed, that does not evince discriminatory animus towards her.

Hall also claims that AstraZeneca's "discouragement from applying to appropriate positions" evinces pretext. *Id.* at 29. For support, she cites her deposition testimony. Hall testified that she "did not apply for [the new] position" because she was "under a great deal of stress" as she prepared to go on parental leave and that she was "told that this would be a lung cancer commercialization role and that it wouldn't be . . . patient-centric." ECF 60-3, at 16–17. This testimony, even when viewed in the light most favorable to Hall, does not show anyone from AstraZeneca discouraged her from applying for the new position or any "appropriate positions." *See* ECF 60, at 29. In fact, Hall testified (in the same part of the transcript cited in her opposition) that she "could have looked up the requisition" for the new position but "did [not] do so." *Id.* at 17. She also admitted that Akkinepally invited her to apply for the new position. *Id*. Other evidence shows Akkinepally said he would be supportive of her if she applied. And during Hall's parental

leave, Read twice sent Hall listings of open positions at the company. Hall did not apply for any of them either. There is no evidence that any AstraZeneca employee discouraged Hall from applying for another position after her position was eliminated.

Hall cannot establish that AstraZeneca's stated reason for her termination was pretext for discrimination.

AstraZeneca is entitled to summary judgment on Hall's MFEPA and MCC claims.

## IV. Conclusion

AstraZeneca's motion for summary judgment is granted on Hall's MFEPA and MCC claims, Counts I, II, and IV. A separate Order follows.

Date: October 2, 2026

Deborah L. Boardman
United States District Judge